**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-3331-WJM-STV

THOMAS CORRIGAN and
AIMEE CORRIGAN,

      Plaintiffs,

v.

LIBERTY INSURANCE CORPORATION,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S RULE 702 MOTION**

---

Plaintiffs Thomas and Aimee Corrigan ("the Corrigans") sue Defendant Liberty Insurance Corporation ("Liberty") for breach of insurance contract and related causes of action arising from Liberty's alleged failure to adequately cover damage to the Corrigans' home, which the Corrigans say was caused by a hailstorm. Currently before the Court is Liberty's Rule 702 Motion to Preclude Certain Expert Testimony of Toby Duncan. (ECF No. 31.) For the reasons explained below, the Court grants this motion in part and denies it in part.

## I. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). Admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of

> an opinion or otherwise if: (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier of
> fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

An expert's proposed testimony also must be shown to be relevant and otherwise admissible. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 n.7 (10th Cir. 2016). To be relevant, expert testimony must "logically advance[] a material aspect of the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011).

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).

## II.  BACKGROUND

The Corrigans claim that the May 8, 2017 hailstorm in the Denver Metro area, "the costliest hailstorm in Colorado history," damaged their concrete tile roof, causing

water to leak into their home.  (ECF No. 39 at 1; *see also* ECF No. 40 at 8.)[1]  In June or July 2017, the Corrigans hired Toby Duncan to inspect their roof.  (ECF No. 31-1 at 9–10.)

Mr. Duncan works for a company called Precision Construction & Roofing.  (*Id.* at 4.)  His job is to travel to places where tile roofs may have been damaged by hail, to inspect those roofs, to encourage homeowners with damaged roofs to submit insurance claims, and, if retained by the homeowner, to work with the insurance company on scope of repairs, and then to supervise the repairs.  (*Id.* at 5.)  As of July 2017, Mr. Duncan had approximately four years of experience in this industry.  (*Id.*)

Mr. Duncan inspected the Corrigans' roof, reported to them that the roof had sustained hail damage, and developed an estimate of the scope of repairs.  The Corrigans have now designated Mr. Duncan as a Rule 26(a)(2)(C) expert, *i.e.*, a non-retained, percipient witness who applied expertise to interpret what he perceived.  (ECF No. 39-6 at 2.)  As the rule authorizes, the Corrigans disclosed only a summary of Mr. Duncan's expected opinions, rather than a detailed report.  (*Id.* at 2–6.)

As described in more detail below, the Corrigans expect Mr. Duncan to testify that their home was damaged by hail and requires a complete roof replacement, contrary to Liberty's position that it is unclear whether the May 8, 2017 hailstorm caused any damage covered by their policy, and, in any event, only a few tiles need replacing.

### III.  ANALYSIS

Liberty challenges eight of Mr. Duncan's expected opinions, which it labels in numerical order, *i.e.*, Opinions 1 through 8.  Bracketed numerals below preceding a

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

quotation correspond to Liberty's numerical designations.

## A.   Reliability Challenges

Liberty first challenges certain opinions as unreliable "because they are not based upon sufficient facts and data or upon reliable methodologies." (ECF No. 31 at 6.) The parties agree that "the appropriate methodology" to identify whether hail has been the cause of damage to a concrete tile roof "is to examine whether there is damage [consistent with hail] to the collateral areas of the home [such as mailboxes or downspouts] and the soft metals on the roof, including flashing, pipe jacks, exhaust vents, and gutters." (*Id.*; ECF No. 39 at 4; ECF No. 31-1 at 6.) As Mr. Duncan put it at his deposition, "If there's no dents in any of that, then there's probably not any hail [damage] up [on the roof]." (ECF No. 31-1 at 6.)

1.   <u>Opinions 2 & 8</u>

[2] Mr. Duncan will testify that he found dents in the roof's metal flashing, including that around the chimney and the counterflashing, consistent with hail damage. This flashing no longer meets Denver's building code requirements. In order to replace the hail-damaged flashing, three feet of tile on either side of the flashing must be removed. (ECF No. 39-6 at 2–3.)

[8] If the Corrigans were to pay out-of-pocket for a new roof, they would also have to replace the hail-damaged flashing. This is a direct physical loss to their roof as a result of a covered peril. Liberty Mutual would be liable to indemnify the Corrigans against such a loss. (*Id.* at 6.)

Liberty says that these opinions are unreliable because Mr. Duncan "does not recall seeing hail damage to valley metals, flashing, counter-flashing, the roof vent, or the pipe jacks on [the Corrigans'] roof." (ECF No. 31 at 6; *see also id.* at 7–8.) Thus, says Liberty, he does not have the data that the methodology requires to identify hail damage on the roof. (*Id.* at 8.)

The Corrigans respond that Mr. Duncan, at his deposition, recalled seeing "damage to the soft metals" generically; that he took photographs of damage to chimney flashing that was consistent with hail; and, although he does not specifically recall seeing or taking a photo of damage to valley metals, he included replacement of valley metals in his repair estimate, leading him to believe that he saw damage to those metals at the time.  (ECF No. 39 at 4; *see also* ECF No. 31-1 at 10, 28, 29, 33.)  Admittedly, however, he says that most of the photos he took are now lost because his computer crashed and he accidentally went swimming with his phone in his pocket— meaning the only photos he took that still exist are the relatively few he e-mailed to someone else before the crash and the swimming incident.  (ECF No. 31-1 at 9.)

Despite the potential weaknesses in Mr. Duncan's testimony, the Court must keep in mind that he claims to be an eyewitness to what he says was soft-metal damage consistent with hail strikes.  Thus, the question is whether his testimony in this regard is credible.  Liberty cannot ask this Court to opine on his credibility in the guise of a sufficient-facts-or-data ruling.  The Court therefore overrules Liberty's objections to Opinions 2 and 8.

2.    Opinions 1 & 7

> [1] Mr. Duncan will testify that he inspected the Corrigans' roof multiple times and opine that, based on his roofing experience and observations, hail damaged the roof and is the cause of the leak that has caused interior damage to the Property.  (ECF No. 39-6 at 2–3.)

> [7] He will opine that the hail storm of May [8], 2017 caused damage to the underlayment of the Corrigans' roof on the north side of their home.  The damage to the underlayment created a leak which damaged the interior of the Corrigans' home.  (*Id.* at 5.)

Liberty's objections to these opinions fall into two categories, which the Court will

address in turn: first, how/whether the underlayment was damaged; and second, when it

was damaged.

> a.   *Underlayment*

Concerning the underlayment, the relevant testimony from Mr. Duncan's

deposition is as follows:

> A. . . . There was a section—it would be Slope E on the eagle view report that had a lot of damage to it.  And he was having a leak, and this is the most obvious source of that leak.  It appears that either wind or—either hail damaged it or wind knocked the tile lose and it fell from a higher slope and broke several of the tiles below and created a place where there was a leak.  Mr. Corrigan had told me that prior to the storm that he did not have a leak.
>
> Q. So on this Slope E, you're saying hail or wind blew tiles from a higher slope, broke tiles on the bottom slope, and created an opening?
>
> A. Yes.
>
> Q. Did it pierce the underlayment?
>
> A. It would have had to.
>
> Q. Did it?
>
> A. It would have had to.
>
> Q. Did you observe an actual opening in underlayment?
>
> A. No.  I did not bother to sort the tiles or remove the tiles. It's not a safe place for me to walk to.  There's not safe footing.

(ECF No. 31-1 at 10.)  Mr. Duncan's statement that "[i]t would have had to" is apparently

informed by the fact that the underlayment is what makes the roof watertight, and the

tile's "main purpose is to protect the underlayment."  (*Id.* at 18.)  Mr. Duncan also

learned that the leak into the house happened underneath Slope E.  (*See id.*)

Liberty does *not* claim that this type of causation opinion (hail or wind dislodged tiles from a higher slope, causing them to fall onto a lower slope, creating damage that could pierce the underlayment) is inappropriate under the circumstances.  The Court further notes that Mr. Duncan, at his deposition, identified photographs depicting what he described as missing tiles on an area above Slope E and damaged tiles on Slope E itself.  (ECF No. 31-1 at 17–18, 23.)  Keeping these premises in mind, the Court turns to Liberty's arguments against this opinion.

Liberty first notes that Mr. Duncan "acknowledge[d]" at his deposition "that the roof was likely at least 20 years old, and that the underlayment could have been compromised before the storm occurred."  (ECF No. 31 at 8.)  But the presence of an alternative explanation does not necessarily mean that Mr. Duncan's explanation is unreliable.  The Court therefore rejects whatever argument Liberty intended to make through this observation.[2]

Liberty next emphasizes that Mr. Duncan never went looking for the pierced section of the underlayment.  (*Id.*)  Liberty characterizes this as a lack of "supporting facts or data."  (*Id.* at 8–9.)  Liberty ignores Mr. Duncan's observations of damage to tiles on Slope E and Mr. Corrigan's report that the roof was leaking under Slope E, combined with Mr. Duncan's knowledge that the underlayment is what prevents water from seeping through the roof.  Accordingly, Mr. Duncan's causation opinion is not so

---

[2] For the first time in its reply brief (*see* ECF No. 46 at 2), Liberty raises *Bitler*'s purported requirement that experts must "reason[] to the best inference."  400 F.3d at 1237.  The Court has elsewhere described its uncertainty about how broadly the Tenth Circuit intended the *Bitler* gloss to reach.  *See Olivero v. Trek Bicycle Corp.*, 2018 WL 3102811, at *3–4 (D. Colo. June 25, 2018).  It is especially unclear whether *Bitler* applies to Rule 26(a)(2)(C) experts, and Liberty forfeited the argument in any event, having failed to raise it in its opening brief.

divorced from facts or data as to make it unreliable.[3]

      b.    *Timing*

Concerning the date of the relevant hailstorm, it is unclear whether the Corrigans accurately represent Mr. Duncan's intent to opine that it was the May 8, 2017 hailstorm, specifically, that caused the damage to their roof.  At his deposition, he could not recall the date of the storm, in part because he had been to Denver at least three times in the last few years after different hailstorms.  (ECF No. 31-1 at 9–10.)

Assuming Mr. Duncan intends to testify that the May 8, 2017 storm damaged the Corrigans' roof and caused it to leak, to the exclusion of other storms or other possibilities, the Court agrees with Liberty that such an opinion is inadmissible because he has not provided any basis—even in the summary form required by Rule 26(a)(2)(C)—to judge the reliability of that opinion.  At most, it appears that he would be making a lay inference (not an expert inference) based on Mr. Corrigan's report to him that the roof had not leaked before the May 8 hailstorm.

The Court therefore sustains Liberty's objection to any opinion from Mr. Duncan that the May 8, 2017 hailstorm, as opposed to some other event or condition, caused the damage that he observed and the water leak that Mr. Corrigan reported.  The Corrigans are free, of course, to testify that their roof had not leaked before May 8, 2017 and invite the jury to make the causation inference.

---

[3] Notably, Liberty itself has never inspected the underlayment.  Like Mr. Duncan, Liberty has a theory about how water leaked through the underlayment (specifically, wind-driven rain got under the tiles and leaked through underlayment that had deteriorated naturally over time, *see* ECF No. 32-13), but it has taken no steps to verify its theory.

**B.   Relevance & Reliability Challenges**

   1.   <u>Opinion 3</u>

> [3] Tiles will break during repairs.  On an older roof, like the
> Corrigans', the industry standard repair factor is three broken
> tiles for every one tile replaced.  It is standard practice for
> both installers and insurance companies to pay for breakage
> when making repairs . . . .  To repair the roof by individual
> tile replacement as proposed by Defendant would
> necessitate over 2,600 tiles.  (ECF No. 39-6 at 3–4.)

As to this opinion, Liberty first attacks Mr. Duncan's 3:1 breakage factor.  Liberty says that his "only support for his opinion that 'the industry standard repair factor is three broken tiles for every one tile replaced' is his own limited experience with one roofing company."  (ECF No. 31 at 9.)  However, similar to Mr. Duncan's supposed opinion that the storm happened on May 8, 2017 and not some other date, it is far from clear that the Corrigans' Rule 26(a)(2)(C) disclosure accurately represents Mr. Duncan's intent to testify that 3:1 is an "industry standard."  At his deposition, he said only that 3:1 is "[t]he breakage factor on tiles that we generally use."  (ECF No. 31-1 at 25.)  It is unclear if "we" refers to the company he works for (in which case Mr. Duncan is simply explaining his calculations, not rendering an industry-standard opinion), or if it refers to tile roof specialists more generally (in which case he appears to be testifying to an industry standard), or something else.

Even if Mr. Duncan intended to state an industry standard, Liberty has not shown that Mr. Duncan's experience is so minimal that he has no reliable knowledge of such standards in his industry.  Accordingly, Liberty's objection in this regard is overruled.[4]

---

[4] The Court further notes that Liberty's repair estimate presumes that only five tiles need replacing, yet calculates the cost of thirty-five tiles, which is explained as "[a]dditional tile

Liberty further objects that this opinion is simply irrelevant because it arises from the need to remove tile around soft metal components to repair those components, yet the flashing needs no repair. (ECF No. 31 at 9–10.) For the reasons already stated in Part III.A.1, above, the Court overrules this argument as well.

    2.   <u>Opinions 4 & 5</u>

> [4] Mr. Duncan will opine that Defendant's proposed repair of using replacement tiles from Custom Tile Roofing is an unacceptable roofing practice from a professional tile roofer's perspective. Custom Tile Roofing sells salvaged tiles and, due to the tiles' unknown age, unknown previous climate, and unknown prior damage, it is impossible to know how much life is left in the tiles. (ECF No. 39-6 at 4.)

> [5] Putting used tiles with an unknown life expectancy on the Corrigans' roof does not return them to their pre-loss condition and is an inadequate repair under the Corrigans' RCV policy. (*Id.*)

Liberty objects that Mr. Duncan cannot point to any written industry standards backing up these opinions. (ECF No. 31 at 10–11.) Rather, he invokes notions of good workmanship and what an honest contractor should do. (*Id.*) Thus, says Liberty, "he relies on his own experience to justify his position, which is improperly subjective." (*Id.* at 10.)

Liberty must acknowledge, however, that Rule 702 explicitly allows a witness to be qualified as an expert through the witness's "knowledge, skill, *experience*, training, or education" (emphasis added). Liberty therefore is forced to argue that Mr. Duncan "has only worked for one roofing company in the six years he has been in the industry," so "[h]is limited individual experience does not justify his claims regarding the roofing

---

allowance for breakage during installation." (ECF No. 39-3 at 3.) In other words, Liberty assumes a 7:1 breakage factor. If Mr. Duncan is wrong about the industry standard (assuming he intended to state one), he is wrong in a way that favors Liberty.

industry's standards as a whole." (ECF No. 31 at 11.)

Liberty does not explain why six years in the roofing industry, even if only with one roofing company, is not long enough to become familiar with industry standards. Nor is it an obviously insufficient amount of time. Accordingly, this is a matter for cross-examination, not Rule 702 exclusion.

Liberty further argues that Mr. Duncan's opinion about salvaged tile is not relevant to the facts of this case because Custom Tile Roofing "confirms" that it has tiles matching the Corrigans' that "have never been installed on a roof," so the tiles "are neither salvaged nor used." (ECF No. 31 at 11.) However, Mr. Duncan's "understanding" is "that some of [those tiles] have never been installed on a roof" (ECF No. 31-1 at 12), not all of them. If someone from Custom Tile Roofing testifies that it has enough matching tile in stock that is neither salvaged nor used, and the jury believes that testimony, then a jury would naturally discredit this part of Mr. Duncan's opinion. But that is a jury question, not a Rule 702 question. This objection is overruled.

      3.    <u>Opinion 6</u>

> [6] [a] Mr. Duncan will testify that, in his experience, cement tile manufacturers change the dimensions of tiles occasionally, even tiles of a specific profile, without changing the profile name [b] so there can be no guarantee without a fitting that the Westile Series 2000 Double Roman tiles sold by Custom Tile Roofing will fit the Corrigans' roof. (ECF No. 39-6 at 5.)

Liberty objects that this opinion "does not reliably apply the underlying reasoning to the facts of the case" because Mr. Duncan never bothered to compare one of the Corrigans' roof tiles to those available at Custom Tile Roofing. (ECF No. 31 at 11.)

The Court has inserted "[a]" and "[b]" in the above quotation because the two

sections of the opinion must be treated separately.  To the extent Mr. Duncan offers Opinion 6a as an explanation for why, *at the time he formed his opinions*, he did not view the Custom Tile Roofing stock as a viable option, there is no problem.  Liberty offers no reason to believe that Mr. Duncan's experience does not qualify him to testify that manufacturers change the dimensions of their tiles without changing the name.

However, the Court sustains Liberty's objection to Opinion 6b (and to 6a, to the extent offered for a purpose other than that already described).  Summary judgment briefing has established that there is an "exact[]" match between the Corrigans' roof tile and the replacement tile available at Custom Tile Roofing.  (ECF No. 32 at 10, ¶¶ 56–57.)  Thus, Mr. Duncan's opinion would not be relevant and therefore not admissible. *See* Fed. R. Evid. 402.

## IV.  CONCLUSION

For the reasons set forth herein, Liberty's Rule 702 Motion to Preclude Certain Expert Testimony of Toby Duncan (ECF No. 31) is GRANTED IN PART and DENIED IN PART to the extent stated above.

Dated this 22nd day of April, 2020.

BY THE COURT:

William J. Martinez
United States District Judge