**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-3331-WJM-STV

THOMAS CORRIGAN and
AIMEE CORRIGAN,

    Plaintiffs,

v.

LIBERTY INSURANCE CORPORATION,

    Defendant.

## ORDER DENYING DEFENDANT'S SUMMARY JUDGMENT MOTION

Plaintiffs Thomas and Aimee Corrigan ("the Corrigans") sue Defendant Liberty Insurance Corporation ("Liberty") for breach of insurance contract and related causes of action arising from Liberty's alleged failure to adequately cover damage to the Corrigans' home, which the Corrigans say was caused by a hailstorm.

Currently before the Court is Liberty's Motion for Summary Judgment. (ECF No. 32.) This motion is closely connected to Liberty's Rule 702 Motion to Preclude Certain Expert Testimony of Toby Duncan (ECF No. 31), which the Court resolved by separate order earlier today ("Rule 702 Order," ECF No. 57). The Court's summary judgment analysis presumes familiarity with the Rule 702 Order.

For the reasons explained below, the Court denies Liberty's Motion for Summary Judgment.

### I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

**A.  The Policy**

From November 14, 2016, through November 14, 2017, the Corrigans' Denver home was insured by Liberty. (ECF No. 32 at 3, ¶ 1.) The policy covers losses caused directly or indirectly by windstorm or hail, but excludes purely cosmetic losses, and losses caused by wear and tear, marring, or deterioration over time. (*Id.* ¶¶ 2–4.) The policy further states that the Corrigans must provide Liberty with requested records and documents as often as Liberty reasonably requires after a claimed loss. (*Id.* at 4, ¶ 5.)

**B.     The Loss and Liberty's Initial Adjustment of the Claim**

The Corrigans say that their home was damaged by a May 8, 2017 hailstorm, "the costliest hailstorm in Colorado history." (ECF No. 40 at 1.) "A few days after" that storm, the Corrigans reported to Liberty that their concrete tile roof was leaking. (ECF No. 32 at 4, ¶ 6.)

A Liberty adjuster inspected the Corrigans' home on May 30, 2017. (*Id.* ¶ 8.)[1] He used a "ladder assist" (a third party who climbs up to, or on, the roof) to take photos of the Corrigans' roof, which the adjuster reviewed and showed to the Corrigans. (*Id.* ¶ 9.) No party explains what the photos revealed. The adjuster's claim notes, however, state that he "'found no storm-related damage to concrete tile on dwelling roof' and that interior damage to [the Corrigans'] home was 'due to wind-driven rain possibly around low roof valley and around a plumbing stack.'" (*Id.* ¶ 10.)[2] Liberty paid the Corrigans that day for the covered damage found. (*Id.* ¶ 11.) Presumably this damage was interior damage caused by the water leak because—as will become clear shortly—the parties hotly contest whether the roof sustained any covered damage.

**C.     Pursuing the Claim Further**

On June 4, 2017, Mr. Corrigan—having since looked at the roof himself—reported to Liberty that he had discovered broken tiles. (*Id.* ¶ 12.) On June 21, 2017, Mr. Corrigan told Liberty that he would get an estimate for the additional damage he

---

[1] The Corrigans purport to deny that the adjuster inspected the home on May 30, 2017, but their denial is based on the assertion that he did not inspect everything they now deem relevant. (ECF No. 40 at 2, ¶ 8.) They fail to deny that he performed some inspection on that date, and so their denial is disregarded.

[2] According to an adjuster later assigned to the case, the first adjuster "believed that damage to the interior of [the] home was caused by rain water being blown by the wind up and under the tiles on the roof." (ECF No. 32-6 at 1.)

3

found.  (*Id.* ¶ 13.)

Around the same time Mr. Corrigan was communicating with Liberty about the additional damage, Toby Duncan arrived at the Corrigans' home.  (*Id.* at 5, ¶ 14.)  As explained in the Court's Rule 702 Order,

> Mr. Duncan works for a company called Precision Construction & Roofing.  His job is to travel to places where tile roofs may have been damaged by hail, to inspect those roofs, to encourage homeowners with damaged roofs to submit insurance claims, and, if retained by the homeowner, to work with the insurance company on scope of repairs, and then to supervise the repairs.

(ECF No. 57 at 3 (citation omitted).)  Mr. Duncan inspected the Corrigans' roof.  (ECF No. 32 at 5, ¶ 14.)  On July 11, 2017, the Corrigans formally hired Mr. Duncan to help them.  (*Id.* ¶ 15.)

Also in July 2017, the Corrigans hired, at Mr. Duncan's recommendation, a public adjuster named Curtis Wilson.  (*Id.* ¶ 16.)  Liberty received notice of Mr. Wilson's involvement in the claim on July 26, 2017.  (*Id.* ¶ 17.)  The following day, a new Liberty adjuster e-mailed to Mr. Wilson a "repair estimate" (apparently referring to Liberty's estimate generated during the May 2017 inspection) and further stated, "Once you have a chance to send me a copy of your estimate, I can go ahead and set up for a re-inspection."  (ECF No. 32-6 at 2.)  This request was according to Liberty's internal policy "to request an estimate and photos to review to determine if a re-inspection is warranted."  (ECF No. 32 at 5, ¶ 19 (internal quotation marks omitted).)

On July 31, 2017, Liberty's new adjuster reiterated in an e-mail to Mr. Corrigan that Liberty's file, photos, and estimate did not reveal "storm related damages" to the roof, and repeated that he was waiting from more information from Mr. Wilson.  (*Id.* ¶ 20.)  On August 17, 2017, Mr. Wilson provided Liberty with photos of the additional

4

alleged damage, but did not provide a repair estimate. (*Id.* ¶ 21.) On August 21, 2017, Liberty's adjuster again requested an estimate from Mr. Wilson. (*Id.* ¶ 22; ECF No. 32-4 at 3.)

The parties do not say what contact, if any, the Corrigans or Mr. Wilson had with Liberty between August 21, 2017 and October 24, 2017. On that latter date, however, Mr. Wilson informed Liberty that he was no longer working on the Corrigans' claim. (ECF No. 32 at 6, ¶ 23.)

**D.     The Reinspection**

On October 31, 2017, Mr. Duncan began communicating directly with Liberty. (*Id.* ¶ 24.) That day, Liberty asked Mr. Duncan to provide the estimate it had requested of Mr. Corrigan in June and of Mr. Wilson in July. (*Id.* ¶ 25.) Mr. Duncan instead proposed working from Liberty's estimate "after we reinspect." (*Id.* ¶ 26 (internal quotation marks omitted).)

Liberty agreed to a reinspection without first receiving an estimate, and that inspection took place on November 4, 2017. (*Id.* ¶ 27.) Liberty's inspector (different from the inspector that came in May 2017), along with another ladder assist, carried out the inspection. (*Id.* ¶ 28.) The inspector identified five tiles that may have been storm-damaged but paid the Corrigans for thirty-five tiles. (*Id.* ¶ 29.) The extra tiles were to account for the possibility that seven tiles would break for every one tile replaced. (ECF No. 39-3 at 3; *see also* ECF No. 57 at 9 n.4.)

On November 16, 2017, Mr. Duncan contacted Liberty and contested its reinspection estimate, asserting that a full roof replacement was necessary. (ECF No. 32 at 6, ¶ 31.) Mr. Duncan reasoned that many more tiles needed to be replaced than the five identified in the reinspection (in part because he believed that the

underlayment was compromised and needed replacing to ensure water-tightness), and chimney flashing also needed to be replaced.  (ECF No. 32-12.)  Moreover, the company that made the Corrigans' tiles is no longer in business, meaning, in his view, that only a full replacement with a new tile could return the roof to its pre-loss condition. (*Id.*; *see also* ECF No. 39-6 at 4.)

On November 17, 2017, Liberty e-mailed Mr. Duncan and the Corrigans, explained Liberty's disagreement with Mr. Duncan's assessment, but also offered to hire an engineer to assess the underlayment:

> We are at a disagreement on the underlayment.  Based on our investigation, what appears to have happened is that the storm damaged several tiles around the area of the leak, which allowed an increased water flow to the area.  This increased water flow allowed ingress through the underlayment due to pre-existing issues.  Our stance is that the storm did not cause direct damage to the underlayment, so there would be no coverage for this item.
>
> Based on the available evidence, our current position stands at this time.  In an attempt to end the back and forth, we are more than willing to assign a structural engineer to assess the roof.  Their investigation and report should answer the questions of whether or not the underlayment and sporadic cracked tiles are storm damaged.  With the authorization of Mr. and Mrs. Corrigan, we can contact an engineering firm and get this process started.

(ECF No. 32-13.)

### E. Beginning of this Lawsuit

The Corrigans never responded to Liberty's offer to hire an engineer to inspect the roof.  (ECF No. 32 at 7, ¶ 33.)  As far as the record reveals, there was no further contact between Liberty and the Corrigans until an attorney for the Corrigans contacted Liberty on November 30, 2018 (over a year later).  (ECF No. 32-4 at 1.)  The Corrigans filed suit in Colorado state court on December 7, 2018.  (ECF No. 3.)  Liberty removed

the case to this Court on December 27, 2018.  (ECF No. 1.)

## F.     Developments Since the Lawsuit Was Filed

The parties have since discovered that a tile distributor in the Denver area, Custom Tile Roofing, has over 2,700 tiles in stock of the make and model on the Corrigans' roof.  (ECF No. 32 at 10, ¶ 56.)  One of Liberty's experts has "confirmed that an exemplar tile from Custom Tile Roofing exactly matches the dimensions of [the Corrigans'] roof tiles."  (*Id.* ¶ 57.)  Mr. Duncan nonetheless claims that those tiles should not be used on the Corrigans' roof because they no longer come in the original packaging and therefore their lifetime cannot be warranted.  (*See* ECF No. 31-1 at 36.)

## III.  ANALYSIS

The Corrigans assert the usual trio of legal theories, namely, breach of insurance contract, common-law bad faith breach of insurance contract, and unreasonable delay or denial of insurance benefits in violation of Colorado Revised Statutes §§ 10-3-115 and -1116.  (ECF No. 3 at 3–4.)  Liberty seeks summary judgment on all three.  (ECF No. 32 at 11–21.)  The Court will address the breach of contract claim, and then the Court will jointly address the bad faith and unreasonable delay/denial claims.

## A.     Breach of Insurance Contract

Liberty summarizes its attack on the Corrigans' breach of contract claim as follows:

> Here, Plaintiffs cannot establish the second element of their breach of contract claim—that Liberty failed to provide insurance benefits owed to Plaintiffs—because there is insufficient evidence to convince a reasonable jury that (1) any additional damage to their roof was a covered loss and (2) Liberty's repair payment was inadequate. Specifically, Plaintiffs have put forth no credible evidence that hail damaged their concrete roof tiles, no evidence of hail damage to the [s]oft metals of their roof, and no

> evidence that the underlayment of their roof is damaged at all. Plaintiffs have also not put forth any credible evidence that the thousands of locally available tiles that match those on Plaintiffs' roof are inadequate to effectuate a repair for the covered damage. Mr. Duncan's causation and repair opinions, upon which Plaintiffs' entire claim is premised, are not based on sufficient facts or data or on any reliable methodology. Liberty has moved to strike these opinions as unsupported, unreliable, and therefore inadmissible. Without such evidence, the undisputed material facts demonstrate that there is no additional covered damage to Plaintiffs' roof, and that Liberty's repair estimate is more than enough to repair Plaintiffs' covered damage. As such, Plaintiffs' breach of contract claim fails, and this Court should grant summary judgment in Liberty's favor.

(ECF No. 32 at 11–12.)

As explained in the Rule 702 Order, the Court has mostly rejected Liberty's challenges to Mr. Duncan's expert testimony. Of the two instances in which the Court has sustained Liberty's Rule 702 challenge, one—regarding the date of the hailstorm—is irrelevant to the breach of contract analysis. The other—regarding the availability of matching replacement tiles—informs Mr. Duncan's opinion that the whole roof must be replaced, which is part of the Corrigans' breach of contract theory, but it is ultimately a sub-issue. Liberty refuses to pay for repairs to the roof beyond five tiles, whereas Mr. Duncan contends that significantly more is required, including replacing underlayment. Thus, the parties are at a stalemate regardless of whether the entire roof requires replacement on account of non-matching tiles.

Because Liberty's summary judgment argument turns on the inadmissibility of Mr. Duncan's expected testimony, and because the Court has rejected most of Liberty's arguments regarding Mr. Duncan's expected testimony, the Court in turn finds that Liberty has failed to demonstrate a lack of a genuine dispute of material fact regarding breach of contract. The Court therefore denies summary judgment on this cause of

8

action.

**B.      Bad Faith & Unreasonable Delay/Denial**

A statutory unreasonable delay/denial claim requires the plaintiff to prove that the insurer "delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2). A common-law bad faith claim requires the plaintiff to prove that the "insurer's conduct is unreasonable and the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985). Thus, although the common law claim requires proving a state-of-mind element and the statutory claim does not, both claims require proving that the insurer acted unreasonably. In this light, Liberty argues that both the common law and statutory claims fail because the Corrigans "cannot put forth sufficient evidence to prove . . . that Liberty unreasonably delayed or denied their claim, or that Liberty acted unreasonably at all." (ECF No. 32 at 16.)

The Corrigans respond that the following is enough to show unreasonableness:

- despite indisputable water leakage into the home through the roof, Liberty's original (May 2017) inspection did not include a search for the source of the leak;

- Liberty said it found no "storm related" roof damage in its original inspection, but Mr. Corrigan found broken tiles on the roof only a few days later;

- based on an internal policy, rather than a requirement of the insurance policy, Liberty required the Corrigans to develop a repair estimate before

> Liberty would come out to reinspect the home; and
>
> - when Liberty eventually reinspected in November 2017, it still did not search for the source of the leak.

(ECF No. 40 at 12–13.)

The Corrigans further argue that their theory of liability "does not require an expert and is fully within the jury's ability to make determinations as to whether Liberty acted reasonably given the facts and circumstances surrounding this claim." (*Id.* at 13.) The Court understands this to be the Corrigans' response to one of Liberty's arguments for summary judgment in its favor, namely, that the Corrigans' bad faith expert does not provide a sufficient basis for the industry standards that Liberty supposedly violated when handling this claim. (*See* ECF No. 32 at 9, 16–17, 19–20.) The Corrigans thus appear to be asserting that the Court need only evaluate whether a reasonable jury, relying on lay inferences alone, could find in the Corrigans' favor on the reasonableness element of the statutory and common law claims. *Cf. Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344–45 (Colo. 2004) (holding, in the context of a car accident investigation, that expert testimony was not needed to sustain the bad faith claim because "[t]he reasonableness of an insurer's investigation into the underlying events . . . is not a technical question and does not require additional professional training beyond the knowledge of the average juror").

Liberty does not reply to the Corrigans' claim that they can prove unreasonableness without expert testimony. (*See* ECF No. 47 at 20.) Having carefully reviewed the evidence, the Court agrees with the Corrigans that it would be within the competence of a lay jury to conclude that Liberty acted unreasonably when it received a

claim that a previously sound roof was leaking after a major hailstorm and it never investigated the cause of the leak, but instead developed a theory that presumed an already-deteriorated underlayment. Liberty naturally emphasizes that it offered to hire a structural engineer to investigate the roof, and the Corrigans never responded to that offer. (ECF No. 32 at 20; ECF No. 47 at 20.) But that offer came in November 2017, about six months after the Corrigans filed a claim. If a reasonable jury were to conclude that Liberty's initial reliance on theory, rather than investigation, was unreasonable, then Liberty's about-face six months later is not relevant to liability.

Consequently, there remains a genuine dispute of material fact on the question of whether Liberty handled this claim reasonably.[3] Accordingly, Liberty is not entitled to summary judgment on the Corrigans' bad faith and unreasonable delay/denial claims.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Liberty's Motion for Summary Judgment (ECF No. 32) is DENIED;

2. In light of District of Colorado General Order 2020-6, which continues all jury trials through May 29, 2020 as a result of the COVID-19 pandemic, the Final Trial Preparation Conference scheduled for May 7, 2020, and the jury trial scheduled to begin on May 18, 2020, are both VACATED;

3. The Court hereby RESETS this matter for a Final Trial Preparation Conference on **September 24, 2020 at 3:00 PM**, and a four-day jury trial beginning on **October 13, 2020 at 8:30 AM,** both in Courtroom A801.  Counsel are directed to

---

[3] Indeed, as to common-law bad faith, failure to properly investigate is a viable cause of action—assuming proof of the other elements of the claim, and of relevant damages—even if it turns out that the policy does not cover the loss. *See Domokos v. Shelter Mut. Ins. Co.*, 416 F. Supp. 3d 1209, 1232–33 & n.15 (D. Colo. 2019).

this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial.  In so doing, the parties are strongly encouraged to take advantage of the "Trial Preparation Conference & Pretrial Checklist" available [here](here).

Dated this 22nd day of April, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge